IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| JOSE ESCOBAR, <br> TDCJ-CID No. 02013427, <br><br> Plaintiff, <br><br> v. <br><br> ROBERT ALMANZA JR., *et al.*, <br><br> Defendants. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | Case No. 2:22-CV-00082-Z-BR |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION TO
GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendants' Motion for Summary Judgment on the issue of qualified immunity (the "Motion"). (ECF 55). For the reasons stated herein, the Magistrate Judge recommends that the Motion be GRANTED.

## I. FACTUAL BACKGROUND

During the relevant time period, Plaintiff Jose Escobar ("Escobar") was a prisoner at the Jordan Unit of the TDCJ. On November 22, 2021, Escobar notified Officer Braden Tapp ("Tapp") that he had received a note known as a "kite," which is a form of communication between prisoners. (ECF 56-1 at 4-5, 8, 9). The kite had been slipped under his door and contained threatens to harm Escobar. (*Id*. at 9). Tapp, in turn, notified Defendant April Stevens ("Stevens"), who removed Escobar from general population and placed him in Offender Protection Investigation ("OPI") Status. (*Id*. at 3-5, 8). An investigation was initiated the following day. (*Id*.)

Defendant Benjamin Minyard ("Minyard") handled the investigation. (*Id*. at 3). Minyard interviewed Escobar, who told Minyard that he "can't be here" and that other inmates think he

1

works for Defendant Wade Alexander ("Alexander"), the assistant warden. (*Id*. at 5). Minyard also interviewed two other inmates. Both refused to make written statements, but made verbal comments that were recounted in Minyard's report. Inmate Christopher Gonzales told Minyard that Escobar "ain't nobody. Ain't no one passing him kites…. He's a dumbass that's just trying to get himself off this unit acting like he is somebody." (*Id*. at 7). Inmate Dimas Deleon told Minyard that inmates "washed their hands of [Escobar] because he works for Alexander" and that he didn't think Escobar "would have an issue if he was back on the unit but then again, I don't know because so many people can't stand his ass." (*Id*.). Minyard's report concludes:

> [A]fter investigating the claims from inmate Escobar and the statements from other inmates none of the statements confirm [h]is claims. There is no evidence that points to any person or group making any threats specifically towards inmate Escobar. He has given no names or names of groups making any of the claimed threats.

(*Id*.). On November 30, 2021, the Unit Classification Committee ("UCC"), chaired by Alexander, notified Escobar in person that, based upon the preponderance of the evidence discovered in Minyard's investigation, the UCC determined that the threat of violence to Escobar was unsubstantiated. (ECF 3 at 12, 56-1 at 6).

Also on November 30, 2021, Escobar reported that he had received a fourth kite under his door on November 24, 2021. (ECF 56-2 at 3, 4, 8, 9). However, the undisputed evidence shows that Escobar presented only two of the kites for investigation. (*See* ECF 56-1 and 56-2). Escobar again was removed from general population and a second OPI investigation was instigated based upon the second presented kite. (ECF 56-2 at 3). This investigation was handled by Genoveva Acosta ("Acosta"). (*Id*.). Acosta interviewed Escobar, who told her that he "is being threatened by the [Tango Blast gang] to leave the Unit because he is 'snitching.'" (*Id.* at 5). He further stated that he did not know who put the kite under his door, and that he had not been verbally threatened.

Escobar claimed that Minyard's investigation into the first kite made him look like a snitch "by pulling out Inmates and giving them too much information." (*Id*. at 5-6).

During her investigation, Acosta interviewed the inmates who had been interviewed by Minyard in connection with the first investigation. Inmate Gonzales, a Tango Blast member, told Acosta that he "does not know anything about Inmate Escobar and has only observed him in the wing while he lived there." (*Id*. at 7). Inmate Deleon, also a Tango Blast member who lived in the same wing as Escobar, said that Escobar "had a loud mouth and would start issues with everyone" and may have had issues with black inmates. (*Id.*). Deleon further stated, however, that he "does not believe [Escobar] is in any danger from anyone and stated that he probably owes people money." (*Id.*). Because of Deleon's suggestion that Escobar had issues with black inmates, Acosta interviewed Frankie Williams, a black inmate who lived in the same wing as Escobar. Williams stated that Escobar was "a druggie who was always asking inmates for something to smoke." (*Id.*) He further stated that Escobar had issues with everyone, including officers, and not just black inmates. (*Id.*) Acosta's report concludes:

> At the conclusion of the investigation and with the interviews conducted the allegations given for the investigation were unsubstantiated. There is no evidence found that proofs [sic] that the Tango Blast sent Inmate Escobar the threatening notes. With the interviews conducted it was found that Inmate Escobar liked to argue with Inmates [and] Officers and liked to smoke. It is possible Inmate Escobar owed money to other Inmates.

(*Id*.). On December 2, 2021, the UCC, chaired by Defendant Robert Almanza ("Almanza"), notified Escobar in person that, based upon the preponderance of the evidence discovered in Acosta's investigation, the UCC determined that the second threat of violence to Escobar was unsubstantiated. (ECF 3 at 13).

On December 25, 2021, while walking on a sidewalk after leaving the dining hall, Escobar crossed paths with inmate Duane Garza ("Garza"). Garza stepped across the sidewalk and began

3

assaulting Escobar. (ECF 56-3 at 6). Lt. Megan Stevens witnessed the assault and ordered both to stop. Both complied. She handcuffed both inmates and noticed that Escobar had large slash marks down his jacket. Both inmates were escorted to restrictive housing. (*Id.*) Defendant Leo Ramirez ("Ramirez") conducted strip searches on both inmates and found a weapon on Garza in the form of a razor blade tied to a pen case. (*Id.*). Both inmates were screened by medical, with only minor injuries noted, although the report does not state which inmate suffered the injuries. (*Id.*). No medical treatment was required. (*Id.* at 5). Garza was charged with attempting to assault another inmate with a weapon, and Escobar was removed from general population and placed in OPI pending the outcome of a third investigation. (*Id.* at 3).

Megan Stevens conducted the third investigation and the report primarily consisted of her eyewitness account of the attack. On December 29, 2021, the UCC, chaired by Almanza, notified Escobar in person that both the threat of violence and actual violence were substantiated. (ECF 3 at 14). The UCC recommended a transfer due to the assault. (ECF 56-3 at 7). The parties in this case do not indicate in the record whether Escobar was transferred as a result of the substantiated charge, but the Court notes that Escobar was no longer housed at the Jordan Unit at the time he filed suit on August 29, 2022.

In his Complaint, Escobar alleges that Defendants Bryan Collier, Almanza, Alexander, Safe Prisons Sgt. Benjamin Rodriguez, Chief of Classification Bobbie Osborne, Lt. Tyler Maxwell, Minyard, Ramirez and Stevens violated his Eighth Amendment rights by failing to protect him, despite having notice that he was in danger. Escobar was appointed counsel in this case. On February 13, 2024, Defendants filed the Motion, alleging that they are entitled to summary judgment on Escobar's claims based on their affirmative defense of qualified immunity. Escobar responded to the Motion, claiming that material fact questions exist that preclude

4

summary judgment.

## II. SUMMARY JUDGMENT STANDARD

**A.     Summary Judgment Standard.**

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must resolve all reasonable doubts in favor of the party opposing the motion. *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The movant has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Anderson,* 477 U.S. at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure all of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). When the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248-49). The nonmovant must provide affirmative evidence to defeat summary judgment.

*Anderson*, 477 U.S. at 257. No "mere denial of material facts nor...unsworn allegations [nor] arguments and assertions in briefs or legal memoranda" will suffice to carry this burden. *Moayedi v. Compaq Comput. Corp.*, 98 F. App'x 335, 338 (5th Cir. 2004). The Court requires "significant probative evidence" from the nonmovant in order to dismiss a request for summary judgment supported appropriately by the movant. *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001). The Court must consider all evidence but must not make any credibility determinations or weigh the evidence. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

**B.    Defendants' Qualified Immunity Defense Alters the Burden of Proof.**

Defendants move for summary judgment on their affirmative defense of qualified immunity. "The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Argueta v. Jaradi*, 86 F.4th 1084, 1088 (5th Cir. 2023) (citing *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc)). Once an officer pleads qualified immunity, the plaintiff has the burden to establish that the officer violated the plaintiff's clearly established federal rights. *Argueta*, 86 F.4th at 1088 (citing *Estate of Davis v. City of North Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005)). "This is a demanding standard." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015), *cert. denied*, 136 S.Ct. 1517 (2016). Because qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law, … we do not deny its protection unless existing precedent places the constitutional question beyond debate." *Argueta*, 86 F.4th at 1088 (internal citation omitted).

A qualified immunity defense alters the usual summary judgment burden of proof. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to

whether the official's allegedly wrongful conduct violated clearly established law." *Id*. To determine if an official acting within the scope of his or her duties is entitled to qualified immunity, courts conduct a two-step analysis. First, they examine whether the plaintiff has shown a violation of a constitutional right under current law. *Bevill v. Fletcher*, 26 F.4th 270, 275 (5th Cir. 2022) (quoting *Benfield v. Magee*, 945 F.3d 333, 337 (5th Cir. 2019)). Second, if a violation has occurred, courts determine whether the right in question was "clearly established" at the time of the alleged violation, such that the officer was on notice of the unlawfulness of his or her conduct. *Id.* In short, an officer is entitled to qualified immunity "if there is no violation, or if the conduct did not violate law clearly established at the time." *Bailey v. Iles*, No. 22-30509, 2023 WL 8062239 at *2 (5th Cir. Nov. 21, 2023). Courts have the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Each Defendant's conduct must be analyzed separately to determine if he or she is entitled to qualified immunity.

### III. LEGAL ANALYSIS

To defeat the Motion, Escobar must show that each Defendant's qualified immunity defense is unavailable. *King v. Handorf*, 821 F.3d 650, 653–54 (5th Cir. 2016) (internal quotation marks and citations omitted). "The plaintiff must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct." *Id*. at 654 (quoting *Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008)). "To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present 'absolute proof,' but must offer more than 'mere allegations.'" *Id.* (quoting *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)).

A. **Failure to Protect.**

It is well established that "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. 825, 833 (1994); *Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006). This duty, which is grounded in the Eighth Amendment's prohibition against cruel and unusual punishment, is nevertheless a limited one. *Farmer,* 511 U.S. at 832-34. The Eighth Amendment mandates "reasonable" safety, not "absolute" safety. *Newton v. Black,* 133 F.3d 301, 308 (5th Cir. 1998); *Lopez v. LeMaster,* 172 F.3d 756, 759 (10th Cir. 1999) ("We recognize at the outset that neither prison officials nor municipalities can absolutely guarantee the safety of their prisoners."). Every injury suffered by one prisoner at the hands of another does not amount to a constitutional violation by prison officials responsible for a prisoner's safety. *Farmer,* 511 U.S. at 834. The substantial risk and need for protection must be obvious to the custodial officials in order to trigger the inmate's Eighth Amendment rights, and prison officials are not required to guarantee that no attack ever will occur. *See Newton,* 133 F.3d at 308.

To prevail on a failure to protect claim, a prisoner must show that he was incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection. *Farmer,* 511 U.S. at 832-34; *Jones v. Greninger,* 188 F.3d 322, 326 (5th Cir. 1999). A prison official is deliberately indifferent to a prisoner's safety when the official is aware of a substantial risk of harm to the prisoner but disregards that risk by failing to take reasonable measures to abate it. *Farmer,* 511 U.S. at 847; *Cantu v. Jones,* 293 F.3d 839, 844 (5th Cir. 2002). To act with deliberate indifference, a prison official must be "subjectively aware" of the risk; that is, he "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. However, even if a prison official was subjectively aware of the risk, he may be

8

found free from liability if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. Only deliberate indifference will suffice to state a failure to protect claim; mere negligence is not sufficient. *Id.* at 837.

The deliberate indifference standard is an extremely high standard to meet. *Gobert v. Caldwell,* 463 F.3d 339, 346 (5th Cir. 2006); *Domino v. Tex. Dep't of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001). The Fifth Circuit has declined to find deliberate indifference where an official "should have" inferred a risk posed to an inmate; the official must actually draw such an inference. *Adames v. Perez,* 331 F.3d 508, 514 (5th Cir. 2003).

**B.      Defendant Bryan Collier.**

Escobar claims that Defendant Bryan Collier, the Executive Director of the Texas Department of Criminal Justice, had actual notice that Escobar needed physical protection, but displayed deliberate indifference by ignoring Escobar's request. He claims in his Declaration, submitted in his response to the Motion, that he attempted to contact Collier through Collier's ombudsman in an unspecified manner. In response to his efforts, Escobar received a letter stating that Collier, or someone in his office, would investigate Escobar's claims. Escobar states that he received no further communications and knows of no follow-up from Collier. (ECF 62-1 at 2).

To successfully plead a cause of action in a civil rights case, a plaintiff must ordinarily articulate facts that illustrate the defendant's participation in the alleged wrong. *Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir. 1986). Personal involvement entails some causal nexus between the defendant's individual conduct and the constitutional violation. *Douthit v. Jones*, 641 F.2d 345, 346 (5th Cir. 1981). An individual's mere ratification of or acquiescence to another person's conduct is insufficient to establish personal involvement. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Escobar does not allege that Collier participated in making the decisions that placed

Escobar in danger. He has failed to provide evidence showing that Collier "affirmatively participate[d] in the acts that cause[d] the constitutional deprivation …" *Porter v. Epps,* 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Gates v. Texas Dep't of Protective & Regulatory Servs.,* 537 F.3d 404, 435 (5th Cir. 2008)). Escobar solely bases Collier's purported liability on the fact that he "attempted to contact Director Collier through the Ombudsman."[1]

    The mere fact that Escobar attempted to contact Collier does not mean that Collier is personally involved in the alleged violation of Escobar's constitutional rights. "[T]housands of grievances, letters, and complaints are written by inmates each month. The directors and administrators of the prison are not liable for each and every incident raised in each and every one of those grievances or letters on the basis that they have 'personal knowledge' of the claims contained therein." *Robinson v. Stephens*, No. 6:14cv701, 2017 WL 4112363 (E.D. Tex. Aug. 9, 2017); *see also Johnson v. Johnson*, 385 F.3d 503, 526 (5th Cir. 2004) (given the size of the operation that they oversee, the Director of TDCJ, the Senior Warden of the plaintiff's prison unit and the Director of the Classification Division "cannot be expected to intervene personally in response to every inmate letter they receive."). Escobar's attempts to contact Collier, without more, are insufficient as a matter of law to confer personal liability on Collier, and Collier is not liable solely in his capacity as a supervisor of the other Defendants. The doctrine of *respondeat superior* does not apply in § 1983 actions. *Monell v. Dep't of Social Servs*., 436 U.S. 658, 691 (1978);

---

[1]Escobar further alleges that "[w]ith discovery abated in this matter, Plaintiff cannot at this time further investigate what Collier knew or didn't know, nor what steps Collier took, if any, to investigate or prevent the attack against Plaintiff." (ECF 62 at 2-3). The Court finds unavailing the belated assertion that discovery is necessary for a complete response to the Motion. The Court's October 12, 2023, scheduling order states that "[o]n a proper request, the Court may authorize a plaintiff to conduct limited discovery in order to respond to the qualified-immunity issues raised in the expected motion for summary judgment." (*See* ECF 49 at 2). Escobar did not file a Rule 56(d) motion in response to the Motion, nor did he submit a request for discovery on qualified immunity at any time after the scheduling order was entered.

*Williams v. Luna*, 909 F.2d 121, 123 (5th Cir. 1990). Collier is entitled to summary judgment on Escobar's claims against him.

### C.     Defendant Benjamin Rodriguez.

Rodriguez is the Safe Prisons Sergeant of the Jordan Unit. (ECF 62 at 3). Escobar alleges that Rodriguez was present when Escobar told Acosta in connection with the investigation into the second kite that Tango Blast gang members had threatened him because they thought he was an informant. (ECF 62-1 at 2). However, Escobar provides no evidence that Rodriguez participated in the decision to find Escobar's first two claims unsubstantiated, nor does he provide evidence that Rodriguez participated in the decision to house Escobar in an area that could put him in danger. Further, he provides no evidence that Rodriguez had the authority to transfer Escobar to a different unit. As stated *supra*, mere ratification of or acquiescence to another person's conduct is insufficient to establish personal involvement. "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft*, 556 U.S. at 677. Escobar has failed to provide evidence showing that Rodriguez "affirmatively participate[d] in the acts that cause[d] the constitutional deprivation …" *Porter*, 659 F.3d at 446; *see also Johnson v. Thaler*, No. 5:11cv9, 2011 WL 2433623, at *3 (E.D. Tex. May 18, 2011) (supervisory defendants can be held liable only to the extent that they each personally engaged in misconduct). Further, he has provided no evidence that Rodriguez actually inferred a risk to Escobar based solely on Escobar's claims made in the interview with Acosta. *See Adames*, 331 F.3d at 514. Rodriguez is entitled to qualified immunity on Escobar's claims and his Motion should be granted.

**D.      Defendants Wade Alexander, Bobbie Osborne, Leo Ramirez and Robert Almanza.**

Escobar sues Defendants Alexander, Bobbie Osborne, Ramirez and Almanza (the "UCC Defendants"), stating that they had actual notice that Escobar needed physical protection but ignored his "request for safety". (ECF 14 at 5). According to Defendants' Motion, these defendants are members of the UCC.[2] The UCC Defendants contend that they are entitled to qualified immunity because the UCC conducted "necessary and reasonable steps in accordance with established protocol to investigate Plaintiff's allegation of an impending assault." (ECF 56 at 16). Escobar alleges that the UCC Defendants did not reasonably investigate his claims because he was, in fact, attacked, which shows that the UCC Defendants acted unreasonably. (ECF 62 at 3).

The Court assumes for the purposes of this Motion that the UCC Defendants had the requisite subjective knowledge of a substantial risk to Escobar by virtue of Escobar's complaints and the kites delivered to him that he provided to the investigating officers. However, under *Farmer*, prison officials violate the Eighth Amendment only if they are both (1) aware of a substantial risk to inmate safety *and* (2) fail to respond properly. *Johnson*, 385 F.3d at 525. As the *Johnson* court noted, *Farmer* emphasizes that "there is no Eighth Amendment violation if the official 'responded reasonably to the risk, even if the harm ultimately was not averted." *Id.*, *citing Farmer*, 511 U.S. at 844. "Even assuming that all of the defendants knew of the substantial risk to [plaintiff's] safety, there would be no Eighth Amendment violation if the undisputed facts in the record demonstrated that they responded reasonably. Moreover, they would be entitled to qualified immunity unless clearly established law showed that their response was insufficient." *Id.* at 526.

---

[2]The evidence also indicates that Ramirez performed the strip search of Escobar and Garza after Garza's assault on Escobar (ECF 56-3 at 6); however, Escobar makes no complaints about the strip search and it is, therefore, immaterial to the qualified immunity analysis regarding his failure to protect claim.

Therefore, the salient inquiry is whether the undisputed evidence shows that the UCC Defendants' response to the known threat to Escobar was reasonable. After receiving each of Escobar's requests for protection, the UCC Defendants promptly removed him from general population, put him in OPI status, and initiated an investigation, as set forth above. (ECF 56-1, 56-2, 56-3). Courts have found such actions to be a reasonable response to perceived threats to inmate safety. Taking action in response to threats, such as ordering further investigation or separating the plaintiff from a particular inmate who had been threatening him "may well have been reasonable methods of addressing the risk that [plaintiff] faced." *Id.*; *see also Howard v. Blanchard*, No. W-13-CA-327, 2016 WL 9080941 *7 (W.D. Tex. Feb. 17, 2016) ("Responding to an inmate's complaints by referring them for further investigation, separating the inmate from others who allegedly pose a threat, interviewing the inmate, conducting medical exams of the inmate, ultimately transferring the inmate to another prison unit and taking other administrative action fulfills a prison official's duties under the Eighth Amendment."); *Longoria*, 473 F.3d at 594 (5th Cir. 2006) ("We have previously held that responding to an inmate's complaints "by referring the matter for further investigation" or taking other appropriate administrative action fulfills an official's protective duties under the Eighth Amendment.") (citing *Johnson*, 385 F.3d at 526).

Escobar essentially argues that, because he was attacked, the UCC Defendants' actions must have been unreasonable. However, such *ipso facto* evaluation is not the proper standard by which to determine whether the UCC Defendants are entitled to qualified immunity. Escobar provides no evidence showing that the UCC Defendants' response to his complaints was unreasonable, even if such actions ultimately did not prevent the attack. "Deliberate indifference encompasses only the unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McClain v. Galvan*, No. 2:18-CV-192-Z-BR at *2 (N.D. Tex. Feb. 16, 2022)

(Kacsmaryk, J.), *citing McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir 1999). To satisfy the exacting deliberate indifference standard, a defendant's conduct must rise "to the level of egregious intentional conduct." *McClain*, 2022 WL at *2 (citing *Gobert*, 463 F.3d at 351). Escobar provided no evidence of "egregious intentional conduct" sufficient to create a material fact question as to whether the UCC Defendants were deliberately indifferent to his safety by failing to respond reasonably to his requests for protection.[3] Because Escobar failed to create a fact question as to whether the UCC Defendants' conduct violated his constitutional rights, the UCC Defendants are entitled to qualified immunity and their Motion should be granted.

E.  **Defendant Benjamin Minyard.**

Minyard conducted the investigation into Escobar's first request for protection and the first kite he received. (ECF 56-1). Escobar essentially contends that Minyard should have discovered the danger to Escobar, arguing that "the very lack of thoroughness in Minyard's investigation is itself evidence of deliberate indifference." (ECF 62 at 6). However, he provides no evidence that Minyard knew of a substantial risk to Escobar either before or after his investigation. The Fifth Circuit has declined to find deliberate indifference when an official "should have" inferred a risk posed to an inmate; the official must actually draw such an inference. *See Adames,* 331 F.3d at 514. There is no evidence that Minyard subjectively knew of the risk to Escobar such that he was deliberately indifferent to the danger to Escobar. Further, assuming the truth of Escobar's assertion that Minyard's investigation was insufficient, Escobar provides no evidence that raises such insufficiency from mere negligence to deliberate indifference. *See Farmer,* 511 U.S. at 837 (mere negligence is not sufficient to state a constitutional violation). Escobar provided no evidence of

---

[3]Again, the Court is unsympathetic to Escobar's belated complaints about a lack of discovery since he did not request discovery or seek a Rule 56(d) extension of his response date.

"egregious intentional conduct" to create a material fact question as to whether Minyard was deliberately indifferent to Escobar's safety. *See McClain*, 2022 WL at *2. Because Escobar failed to create a fact question as to whether Minyard's conduct violated his constitutional rights, Minyard is entitled to qualified immunity and his Motion should be granted.

F.     **Defendant Tyler Maxwell.**

Escobar claims that Maxwell forced him out of his OPI cell and back to general population after the conclusion of the second investigation by threatening Escobar with chemical spray if he failed to comply with Maxwell's orders. (ECF 62). Escobar claims in his Declaration that he told Maxwell that "they will kill me" but Maxwell still forced him out of protective custody. (ECF 62-1 at 2). At best for Escobar, the evidence shows that Maxwell perhaps "should have" inferred a risk to Escobar; however, there is no evidence that Maxwell actually drew such an inference. *See Adames,* 331 F.3d at 514. Again, Escobar provided no evidence of "egregious intentional conduct" sufficient to create a material fact question as to whether Maxwell was deliberately indifferent to Escobar's safety. Because Escobar failed to create a fact question as to whether Maxwell's conduct violated his constitutional rights, Maxwell is entitled to qualified immunity and his Motion should be granted.

G.     **Defendant April Stevens.**

In response to the Motion, Escobar states that he is abandoning his claims against Stevens. Therefore, it is recommended that Stevens be dismissed from this case.

H.     **Qualified Immunity: No Violation of Clearly Established Law.**

   1.     <u>**Clearly Established Law.**</u>

Even assuming that Defendants' conduct as set forth above resulted in a fact question as to whether Escobar's constitutional rights were violated, Escobar provided no evidence that

Defendants' conduct was not objectively reasonable in light of clearly established law. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation omitted). There are two ways for a plaintiff to demonstrate that a defendant's conduct violated clearly established law. *Batyukova v. Doege,* 994 F.3d 717, 726 (5th Cir. 2021). Under the first, more typical approach, the plaintiff must "identify a case" or "body of relevant case law" in which "an officer acting under similar circumstances ... was held to have violated the [Constitution]." *Id*. While there need not be a case directly on point, the unlawfulness of the challenged conduct must be beyond debate. *Id.* Under the second approach, there can be the rare "obvious case," where the unlawfulness of the officer's conduct is so egregious that it is sufficiently clear although existing precedent does not address similar factual circumstances. *See Doege*, 994 F.3d at 726 (citing *Dist. of Columbia v. Wesby*, 538 U.S. 48, 65 (2018)); *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).

"In determining what constitutes clearly established law, [the Fifth Circuit] looks to Supreme Court precedent and then to [its] own." *Hicks v. LeBlanc*, 81 F.4th 497, 503 (5th Cir. 2023), (quoting *Shumpert v. City of Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018)). When there is no direct controlling authority, "[the Fifth Circuit] may rely on decisions from other circuits to the extent that they constitute a robust consensus of cases of persuasive authority." *Id.* "It is the plaintiff's burden to find a case in his favor that does not define the law at a high level of generality." *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019).

This is not the rare "obvious case" in which the unlawfulness of an officer's conduct is so egregious that it is sufficiently clear such actions violate a prisoner's rights. Further, Escobar provided no case law in response to the Motion that supports his position that any Defendant's

16

alleged conduct violated clearly established law at the time in question. Specifically, Escobar provided no case law to show the following: (1) that Collier's failure to respond to Escobar's efforts to reach him equates to personal involvement in the alleged violation of Escobar's constitutional rights; (2) that Rodriguez's mere presence during Acosta's interview with Escobar, without more, equates to personal involvement in the alleged violation of Escobar's constitutional rights; (3) that the actions taken by the UCC Defendants as set forth above are an unreasonable response to the substantial risk of harm faced by Escobar; (4) that Minyard's alleged insufficient investigation into the first kite meets the deliberate indifference standard under federal law; or (5) that Maxwell ordering Escobar out of his cell and into general population after Escobar told him that his life was in danger, without more, constitutes deliberate indifference under federal law. Therefore, Escobar has failed to show that any Defendant's conduct violated "clearly established" law.

  **2.**   <u>**Defendants' conduct was objectively reasonable.**</u>

"Even if the government official's conduct violates a clearly established right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable." *Wallace v. County of Comal*, 400 F.3d 284, 289 (5th Cir. 2005) (internal marks omitted). "The defendant's acts are held to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the plaintiff's asserted constitutional or federal statutory right." *Cozzo v. Tangipahoa Parish Council—President Gov't*, 279 F.3d 273, 284 (5th Cir. 2002); *see also Stanton v. Sims*, 571 U.S. 3, 6 (2013) (government officials are given "breathing room to make reasonable but mistaken judgments"). Thus, denial of an official's motion for summary judgment predicated upon qualified immunity requires two distinct determinations: (1) "a certain course of conduct would, as a matter of law, be objectively

17

unreasonable in light of clearly established law"; and (2) "a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct." *Hogan v. Cunningham*, 722 F.3d 725, 730 (5th Cir. 2013).

In this case, there is no genuine issue of fact as to the actions taken by the Defendants, as set forth above. Further, as discussed *supra*, the undisputed evidence shows that Defendants' actions were objectively reasonable; therefore, Defendants are entitled to summary judgment on Escobar's claims.

## RECOMMENDATION

As set forth above, the U.S. Magistrate Judge recommends that Defendants' Motion For Summary Judgment be GRANTED as to Defendants Collier, Almanza, Alexander, Rodriguez, Osborne, Maxwell, Minyard and Ramirez. It is further recommended that Defendant Stevens be dismissed from this case.

## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Findings, Conclusions and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED May 15, 2024.

_____
LEE ANN RENO
UNITED STATES MAGISTRATE JUDGE

## *  NOTICE OF RIGHT TO OBJECT *

Any party may object to these proposed findings, conclusions and recommendation. In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E). Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Findings, Conclusions and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge and accepted by the district court. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen,* 857 F.2d 275, 276–77 (5th Cir. 1988).